[No. 36392. Department Two. November 27, 1963.]

THE STATE OF WASHINGTON *on the Relation of Sid O. Leavell et al., Appellant,* v. ANNA M. NELSON *et al., Respondents.*[*]

*Erik Froberg,* for appellant.

*Helsell, Paul, Fetterman, Todd & Hokanson, Richard S. White, Allan D. Loucks, Schneider, Mullavey & Hageman,* and *Charles N. Mullavey,* for respondents.

FINLEY, J.—This is an application for a writ of mandate by 19 appellants, claiming that they wrongfully were denied the right to vote concerning matters affecting the affairs of a cooperative apartment house.

[*]Reported in 387 P. (2d) 82.

The basic question presented by this appeal concerns the extent or "quality" of the interest or ownership which a party must have in a cooperative apartment corporation as a condition precedent to participation in control by exercising the right to vote. A general description or outline respecting the organizational plan of this type of enterprise may be helpful prior to the narration of the facts in the present case.

Ordinarily, a cooperative apartment association is set up by a promoter, who either has an apartment he wishes to sell or can make arrangements to acquire or build one. The apartment building is sold to the cooperative corporation, which issues stock of a total par value equal to the purchase price. This stock is allocated between the individual apartment units according to their estimated relative value and, in a manner of speaking, becomes "appurtenant" thereto. A party wishing to "buy" an apartment pays, or agrees to pay, a price (subscription) equal to the money value of the apartment unit, not for the physical apartment itself, but for the shares in the corporation of an equal par value which are appurtenant to it. The buyer is then issued a proprietary lease to a particular apartment unit for the life of the corporation. The operating expenses of the cooperative are divided among the individual apartment units in the form of monthly assessments. This, with the payments on the subscription, comprises the monthly outlay of the owner.

In this manner the residents of the apartment control the corporation that owns and manages the entire building. Each cooperative member has one vote, regardless of the number of shares appurtenant to his particular unit, and the majority can determine the proper management and expenditure policies in the light of their own best interests as they see them. The minority, if there be any dissenters, are at least protected in the self-interest they share in common with the majority: that of having and maintaining an amenable place to live. Not the least significant consideration—in terms of common interest—is the right of the residents to have a voice or vote in choosing those who

will live in the building as their neighbors. Most cooperative apartments provide that the lease and stock of a member cannot be transferred without the approval of the buyer by the elected representatives of the other members.

■ If the foregoing presents a brief but reasonably accurate outline of the concepts underlying the corporate form of the cooperative apartment, one basic premise should be noted. The buyer's investment and the common interest appear to be best protected when the voting power is distributed one vote to each member, and each member is actually *living in the building*. This basic principle inherent in the cooperative form of enterprise (that the vote should be limited one to each member having a substantial interest in the common purpose) is recognized in the Washington statutes governing incorporated cooperative associations, RCW 23.86. While obviously drafted with the agricultural cooperative foremost in mind, RCW 23.86.110 provides:

". . . [T]he bylaws of the association may allow subscribers to vote as stockholders if one-fifth of the subscription has been paid for.

". . . Such association may also purchase the stock of any stockholder who ceases to produce for the association any of the commodities in which it deals. Payment for any stock purchased may be made out of any available funds whether surplus or not.

"No stockholder at any meeting shall be entitled to more than one vote."

With these observations in mind, we proceed to the facts of the present case.

In 1954, Howard Buck (the principal plaintiff-appellant) organized the Mercedes Cooperative Association, Inc., under RCW 23.86, to operate a cooperative apartment on a plan similar to that outlined above. He sold a 45-unit apartment building to the corporate cooperative on a real estate contract. The stock appurtenant to 22 of the units was sold to third parties, who thereby obtained proprietary leases and became members of the cooperative. Buck, himself, subscribed to the stock appurtenant to the remaining 23 units, one of which he made his residence. Buck paid the

monthly assessments and the subscription payments falling due on these 23 units, as, of course, he was bound to do, whether or not they were vacant. Apparently, the remaining tenant-owners allowed Buck to sublease 22 of the units as if they were ordinary rental apartments to defray the cost burden until they could be "sold."

In 1959, Buck's title to the 23 units was unsuccessfully challenged by some of the tenant-owners. That action resulted in a judgment quieting title to all 23 units in Buck, which judgment has not been appealed. However, the judgment also contained an order that Buck should continue to "attempt to sell to third persons" the apartments he had retained. While the ownership by one person of more than one unit is somewhat inconsistent with the cooperative apartment concept, it has proved to be a commercial necessity in some instances—when the promoter is unable to "sell" all of the units to tenant-owners before the apartment actually begins operation. In this context, the promoter should be allowed to subscribe to the remaining units, subject to a continuing duty to use his best efforts to complete the transaction by sales to tenant-owners. The interests of the tenants are not thereby unduly prejudiced, since the promoter (as in the instant case) can never obtain more than the one vote he gets by actually living in the apartment, despite his multiple holdings. Control over both conditions and potential buyers or renters remains in the resident tenant-owners.

Shortly after Buck prevailed in the above-mentioned litigation, he began a series of transfers to third persons. The end result was that the stock appurtenant to 17 of the "Buck" units was sold to 17 of the 19 appellants in this case. However, these 17 "sales" were handled in a very special manner. In each instance, Buck assigned to the transferee all of his interest in the stock and proprietary lease appurtenant to a particular apartment, and received in return, as the sole consideration, a promissory note equal to his equity in the apartment transferred. As a further condition for each transfer, Buck received a proxy to vote the shares so transferred and an agreement that, in the event of default,

the equity in the shares would revert to Buck. The record indicates that only one of these 17 transferees ever moved into the apartment. The trial court found, on highly convincing evidence, that none of the others had any intention of becoming a resident of the apartment, but instead had purchased the shares for "investment" purposes only.

The actual operation of this "Buck plan" investment program sheds a good deal of light on the implications of it as far as the basic concept of the cooperative apartment is concerned. With the one exception of the transferee who became a resident of the apartment, Buck operated as the rental agent for the "Buck transferees" and treated the units as if they were ordinary commercial rental units. Buck found sublessees, collected rents, and paid the monthly assessments to the cooperative. Any "profit" was simply credited on the balance owing to Buck on the promissory note which he had received for that apartment. If the apartment was vacant for any length of time, Buck simply absorbed the loss and debited it on the note. It is interesting to note that, after the "plan" had been in operation for some time, the balance on many of the promissory notes was actually greater than it had been at the time of the original transfer. Not the least important of the results (if Buck's claim to 17 additional votes because of the proxies is upheld) was that the problem of getting each potential commercial renter approved by the board of directors or "trustees" was for practical purposes eliminated. Remembering that Buck originally reserved 23 units out of a total of 45, control obviously shifts to parties interested in commercial renting instead of those living in the apartment.

The present mandamus action was precipitated by the stockholders' meeting held on May 22, 1961, for the purpose of electing the trustees of the cooperative. Buck claimed the right to 18 votes: 17 by proxy from the "Buck transferees," and 1 vote of his own. The trustees who had been elected while the tenants had control ignored the 17 proxy votes on the ground that none of the 17 "Buck transferees" was a qualified voter. One other member, Grace Norwood,

attempted to cast her vote for the slate of trustees selected by Buck; her right to vote was also denied on the same ground. Grace Norwood, however, had not obtained her interest from Buck, but rather from one of the original 22 tenant-owners, and she was a bona fide resident of the apartment. In all, 18 votes for the slate of trustees selected by Buck were not counted, leading to the election of a slate of trustees chosen by the tenant-owners. Buck, Norwood, and the 17 "Buck transferees" now appeal from a trial court ruling denying them a writ of mandate ordering the trustees to count the proffered "Buck proxy" votes.

■ This judgment must be affirmed as to the "Buck transferees" who were not, as of the time of the shareholders meeting, bona fide residents of the apartment. RCW 23.86.110 provides that "no *stockholder* . . . shall be entitled to more than one vote." (Italics ours.) The term "stockholder" must be interpreted for each general type of cooperative in light of its underlying purposes. While the promoter himself may qualify as a bona fide shareholder, when he finds it *necessary* to subscribe to unsold shares to put the cooperative into operation, the only other bona fide stockholder in such an association is a *resident*. When Buck, as promoter, subdivided his retained apartments among investors rather than residents, he did not thereby increase the number of bona fide shareholders. The nonresident "Buck transferees" hold their shares only by force of Buck's right as promoter, and subject to the duty to attempt to sell to third parties who will become residents. The sum total of this subdivided interest equals *one* "stockholder," and, therefore, one vote.

The above reasoning does not of course apply to any of the "Buck transferees" who were actually living in the apartment at the time of the shareholders' meeting; nor does it apply to those who purchased their interests with, and still retain, a bona fide intent to become a resident within a reasonable period of time. Such parties would be "stockholders" within the meaning of the statute, because of the nature of their interest in the apartment—that of a resident rather than as an investor in a commercial enter-

prise. The trial court found such an interest to exist only in the case of the transferee who had actually moved into the apartment. As to that transferee, the judgment is reversed, and mandamus shall issue ordering the board of trustees to recognize his vote which was cast by Buck by proxy.

On the same reasoning, the judgment of the trial court must be reversed as to Grace Norwood, as she, also, was a bona fide resident of the apartment at the time of the meeting in question.

The cause should be remanded to the trial court for proceedings not inconsistent with this opinion, and with costs allowed to respondents. It is so ordered.

OTT, C. J., DONWORTH, WEAVER, and HAMILTON, JJ., concur.